THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net



**KEYSTONE**
EQUIPMENT FINANCE CORP.

433 S. Main Street, Suite 300 West Hartford, CT 06110
and
525 North Tryon St, Suite 1000 Charlotte, NC 28202
Telephone: 860-233-3663 Fax: 800-444-8333

**EQUIPMENT FINANCE AGREEMENT (EFA)**
**Account #:** ████████403X

| NAME and ADDRESS of BORROWER |
|---|
| FULL LEGAL NAME OF BORROWER            DBA<br>**DB Transports LLC** |
| STREET ADDRESS: 3586 Sangani Blvd, Ste L 307, Diberville, Mississippi 39540 |
| CONTACT: Donsheki Fredrick Barrett            TELEPHONE: ████████ |
| |
| EQUIPMENT SCHEDULE<br> 2021 Ford F-250 SD XL Crew Cab Utility Truck 1FD7W2A65MEC14840 |
| |

**TERMS and CONDITIONS**

| TERM NO. OF MONTHS | PAYMENT | INITIAL PAYMENT | PAYMENT STREAM INCLUDING ANY INITIAL PAYMENT |
|---|---|---|---|
| 36 | $1,375.00 | $1,375.00 | 1 @ $1,375.00<br>35 @ $1,375.00 |

**TERMS:**
The words "Borrower" "You" "Your" and "Debtor" refer to the (BORROWER); "Lender" "Us" "Our" "We" refer to Keystone Equipment Finance Corp.

**1. PAYMENT OF INDEBTEDNESS:** For value received, Borrower (jointly and severally if more than one) agrees to unconditionally pay to Lender the payments indicated above in consecutive monthly installments beginning on the Commencement Date and continuing on the same day of each following month for the number of months indicated for the Term of EFA above plus all other sums coming due in accordance with this Equipment Finance Agreement ("EFA"). Borrower authorizes Lender to insert or correct information on the EFA including Borrower's proper legal name, address, dates, and Equipment description. All notices shall be in writing addressed to Borrower at their address stated herein or to such address as Borrower may provide lender orally or in writing, or to Lender at 525 North Tryon St, Suite 1000, Charlotte, NC 28202.

**2. EQUIPMENT**: Borrower has chosen the equipment as set forth above ("Equipment"). Borrower acknowledges that the Equipment is financed for Borrower solely for commercial or business purposes and not for personal, family, agricultural or household purposes. If the Equipment is unsatisfactory, Borrower's only remedy is against its supplier or manufacturer, and Borrower has no remedy for damages against Lender. Borrower's confirmation to Lender, including without limitation by phone or execution or authentication of an Equipment Delivery & Acceptance certificate, shall constitute Borrower's acknowledgement that Borrower has inspected the Equipment, found it satisfactory in all respects and has accepted it, the date of such acceptance being the "Acceptance Date." Borrower will maintain Equipment location records and provide Equipment location to Lender upon demand. Borrower is responsible for keeping the Equipment in good repair, condition and working order, except for normal wear and tear. Borrower is responsible for complying with all laws relating to the Equipment or its use and to protect the Equipment from damage, seizure, or loss. Borrower will continue to make payments if any damage, seizure, or loss occurs to any part of the Equipment, even if the Equipment is completely destroyed or, at Lender's option, pay Lender the amount described in the Defaults and Remedies section of the EFA on the next payment date.  Lender is not responsible for any losses, damages, or injuries caused by the installation or use of the Equipment or from any other loss while Borrower has the Equipment.

**3. NO WARRANTY: Lender is financing Equipment for Borrower "AS IS," "WHERE IS," AND WITH ANY AND ALL FAULTS. LENDER MAKES NO WARRANTY OR REPRESENTATION, either express or implied as to the condition of the Equipment, its merchantability, its fitness or suitability for any particular purpose, its design, its capacity, its quality, or any other characteristics of the Equipment. Lender is not responsible for packaging, delivery, installation, or testing of the Equipment. Borrower agrees that Borrower has selected the supplier and each item of Equipment based on Borrower's own judgment and disclaims any reliance upon any statements or representations made by Lender. The supplier is not an agent of Lender and nothing the supplier states can bind Lender or affect Lender's liability to Borrower or third parties. Borrower will continue to make all payments under the EFA regardless of any claim or complaint against any supplier.**

**4. REPRESENTATIONS:** Borrower represents and warrants to Lender that: Borrower and each of the individuals signing or authenticating the EFA have the lawful power and authority to enter into the EFA; by entering into the EFA Borrower will not violate any law or other agreement; and the location of Borrower's main office, state of incorporation or organization, exact legal name and place of residence are accurately listed in the EFA. The EFA will constitute Borrower's legal, valid and binding obligation, enforceable against Borrower in accordance with the terms hereof. If a registered organization, Borrower represents and warrants to Lender that Borrower is duly organized, duly authorized, validly existing and in good standing. **THE EFA CANNOT BE TERMINATED OR CANCELED BY BORROWER FOR ANY REASON.** Borrower's obligation to make payments under the EFA is absolute and unconditional.

**5. ASSIGNMENT: BORROWER HAS NO RIGHT TO SELL, TRANSFER, ASSIGN OR LEASE THE EQUIPMENT OR BORROWER'S RIGHTS UNDER THE EFA.** Borrower understands that Lender, without prior notice, has the right to assign, sell or otherwise transfer the EFA. Borrower understands that Lender's assignee will have the same rights and benefits as Lender.  Borrower agrees that the rights of Lender's assignee will not be subject to any claims, defenses or setoff that Borrower may have against Lender.

**6. INDEMNITY**: Borrower indemnifies Lender and Lender's affiliates and Lender and their affiliates' shareholders, directors, officers, employees, agents and assignees against any claims, actions, damages, fines, penalties, causes of action, suits or other legal proceedings or liabilities including all attorneys' fees, arising out of or connected with the EFA or any Collateral (as hereinafter defined), without limitation. Such indemnification shall survive expiration, cancellation, or termination of the EFA.

**7. INSURANCE.** Borrower agrees to keep the Equipment fully insured against loss, theft, damage, destruction with Lender as loss payee, additional insured and beneficiary of a lenders loss payable endorsement, in an amount not less than the original cost of the Equipment for the term of the agreement (including any extension(s) thereof).  Borrower

Initials _DFB_

████████03X

EFA.0624F

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

also agrees to obtain a general public liability insurance policy from a provider and in amounts acceptable to Lender and name Lender as an additional insured on the policy. Borrower agrees to provide Lender certificates or other evidence of insurance acceptable to Lender before the EFA commences, prior to each insurance renewal, and at any time within 10 days of Lender's request. Borrower agrees that if said insurance is not received by Lender, is cancelled, or expires and is not replaced, Lender has the right, but not the obligation, to secure insurance on the Equipment from a carrier of Lender's choosing in such forms and amounts as Lender deem reasonable to protect Lender's interest. Any insurance Lender secures will not name Borrower as an insured, additional insured or loss payee and may not fully protect Borrower's interests and Borrower will pay Lender an insurance charge that will include a premium, which may be substantially higher than the premium that Borrower would pay if placed independently. At any time, Borrower can avoid these costs by delivering the required proof of insurance to Lender. **Nothing in this paragraph will relieve Borrower of Borrower's responsibility for liability insurance coverage on the Equipment.** Lender shall retain any physical damage insurance proceeds arising out of a theft, loss, or damage up to the full amount owed by the Borrower. Borrower will remain responsible for any deficiency. Borrower hereby irrevocably appoints Secured Party (as hereinafter defined) as Borrower's Attorney-in-Fact, coupled with an interest, to make claim for, settle, resolve, receive payment of, and execute and endorse all documents, checks or drafts received in payment for any loss or damage under any of said insurance policies and to execute any documents or statements related thereto, including without limitation the power to subrogate Borrower's interest in the Equipment to the insurer.

**8. PAYMENTS, EQUIPMENT ACCEPTANCE, FEES & OTHER CHARGES, PREPAYMENT** Borrower agrees to pay Lender the Initial Payment on the Acceptance Date and the periodic payments for the term (including any amendments) of the EFA as described above plus any applicable sales tax, use tax or property tax. Lender has the right to apply all sums received from Borrower to any of the Obligations (as hereinafter defined). All sums received by Lender shall, at Lender's option, be applied first to interest, late charges, costs, fees, and expenses, and then to principal of Obligations, or, without limitation in the event of an early payment that does not satisfy the conditions for prepayment hereunder, towards installment payments not yet due. Borrower agrees to pay Lender a nonrefundable documentation fee plus all other reasonable fees associated with the EFA, including, but not limited to, credit inquiry, site inspection, appraisal, UCC search and filing, titling fees and costs, including a termination fee of up to $850 upon termination of this agreement.   Borrower's signature hereon or other authentication hereof is an irrevocable offer to enter into the EFA. In the event that Borrower signs or otherwise authenticates the EFA but the Commencement Date does not occur within 90 days thereafter, Lender at its option may elect not to provide financing contemplated by the EFA, and the advance payments, documentation fee, termination fee, and deposit may be retained and/or collected by Lender to compensate for documentation, processing, and other expenses. A late payment charge of the greater of $15 or 7% of the amount due will be assessed on any payment not fully paid in good funds within 6 days of the due date and shall be immediately due and payable. Borrower also agrees to pay Lender's standard NSF fee of $75 for each payment returned for insufficient funds. At Lender's discretion, the Initial Payment, if any, will be applied to payments as indicated in the "Terms and Conditions" box on page 1 hereof. Borrower agrees to promptly inspect the Equipment as it is delivered and immediately sign and return to Lender the Delivery and Acceptance certificate. On the Acceptance Date, the installment schedule of remaining payments hereunder (excluding and without regard to any Initial Payment required hereunder) will commence as set forth below.

| Acceptance Date | Payment Due Date |
|---|---|
| If occurring between 1st and 14th of month | The 5th of the following month |
| If occurring between 15th and end of month | The 20th of the following month |

The remaining payments shall be due and payable on the same day of each consecutive month thereafter until all payments under the Term of EFA and any other sums payable under the EFA are paid in full. In the event any sums payable under the EFA have not been paid in full on the due date of the final payment, Borrower shall, within five (5) days of the due date of the final payment, pay the entire outstanding balance hereunder to Lender. **The Original Finance Amount of this contract is $37,000.00.**  Payments under this EFA include pre-computed interest on the basis of a 360-day year and for the actual number of days elapsed, unless such calculation would cause the effective interest rate to exceed the maximum rate allowed by applicable law, in which case such calculation shall be computed on the basis of a 365-day year.  If any amount agreed to, charged or received under this agreement would, but for this section, exceed the maximum lawful amount allowed by a usury or other applicable law, such amount shall be automatically and strictly limited to the amount allowed by applicable law.  If any amount in excess of the lawful amount is received, it will be credited to amounts that are lawfully due and owing by you or will be refunded to you. **PREPAYMENT**: Borrower may, subject to the terms and conditions contained herein, prepay this EFA in full at any time, provided Borrower shall: (i) give five days prior written notice to Lender specifying the principal amount and date of any proposed voluntary prepayment and the indebtedness being voluntarily prepaid; (ii) pay the amount specified in such voluntary prepayment notice, in good funds, on the date specified in such notice; (iii) simultaneously pay, in good funds, all principal, interest, late charges, and other charges accrued and/or due to Secured Party through the date of any such voluntary prepayment; and (iv) simultaneously pay a prepayment premium equal to the sum of .00834 of the principal amount then being prepaid multiplied by the number of whole or partial calendar months between the date of the prepayment and the scheduled final maturity date of the indebtedness being prepaid but not more than the maximum amount permitted by law (the "prepayment premium"). The prepayment premium shall also apply and become immediately due and payable in the event of any full or partial prepayment of principal hereunder, whether voluntary or involuntary, and in the event of acceleration of the indebtedness hereunder, whether or not payment of the accelerated balance has been made. The principal amount of any partial prepayment shall be applied in any manner acceptable to the Lender in the Lender's sole discretion including to the scheduled installments of the indebtedness then being prepaid in the reverse order of their respective maturities, so that the amount and due date of only the latest maturing installment(s) shall be affected thereby. At Lender's option, upon partial prepayment, the remaining principal balance may be re-amortized over the remaining term of this EFA. If Lender receives an early payment that does not satisfy the conditions of prepayment herein, Lender may apply such sums to the Obligations in accordance with the terms hereof.

**9. DELIVERY & ACCEPTANCE OF EQUIPMENT:**  YOU AGREE TO ACCEPT AND COMMENCE THIS FINANCING AGREEMENT UPON SATISFACTORY DELIVERY OF THE EQUIPMENT PER THE VENDOR INVOICE DATE AND YOU WILL BE DEEMED TO HAVE ACCEPTED THE EQUIPMENT FOR ALL PURPOSES UPON SATISFACTORY DELIVERY OF THE EQUIPMENT, WHICH LENDER MAY CONFIRM ORALLY.  YOU CANNOT LIMIT OR REVOKE YOUR ACCEPTANCE AT ANY LATER DATE.  THE INSTALLMENT SCHEDULE OF PAYMENTS WILL BEGIN UPON THE DATE OF ACCEPTANCE.  AFTER YOUR ACCEPTANCE OF THE EQUIPMENT, YOU MAY NOT CANCEL THIS AGREEMENT DURING THE AGREEMENT TERM.

**10. TAXES**: Borrower agrees to pay when due or at a frequency set by Lender all taxes (including sales, use, and personal property tax, fines and penalties) and fees relating to the EFA or the Equipment. Borrower shall make payments for all taxes directly to the taxing agencies unless otherwise directed by Lender. If Lender makes payment on any of the above, Borrower agrees to reimburse Lender.

**11. EQUIPMENT OWNERSHIP:** Borrower is the owner of the Equipment and has title to the Equipment subject to Lender's lien. Borrower agrees to keep the Equipment free and clear of all liens, claims and encumbrances. Lender has the right to inspect the Equipment at any time.

**12. SECURITY AGREEMENT and UCC FILINGS**: To secure the prompt payment, performance and fulfillment of any and all Obligations, Borrower hereby assigns, transfers, conveys, pledges, mortgages and grants to Secured Party a security interest and lien in the Equipment described herein and any and all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind, wherever located, in which Borrower now or hereafter has any right or interest, except and specifically excluding household goods and personal wages, and in any and all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-

Initials _DFB_

03X

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing (collectively and including the Equipment, "Collateral"). Borrower hereby represents that Secured Party's security interest in the Equipment has and will continue to have first priority until all Obligations are satisfied.  "Equipment" includes all replacements, parts, repairs, additions, accessions and accessories incorporated in the Equipment or affixed to the Equipment and any and all proceeds of the foregoing, including, without limitation, insurance proceeds.  Borrower authorizes Secured Party to file UCC Financing Statements or similar instruments to evidence Secured Party's security interest in the Collateral. Borrower hereby irrevocably appoints Lender and Secured Party each as the true and lawful Attorney-in-Fact of Borrower, coupled with an interest, with full power in Borrower's name, place and stead to do any and all acts on Borrower's behalf necessary or helpful to perfect and continue perfection of Secured Party's security interest in the Collateral pursuant to the Uniform Commercial Code or other applicable law including, but not limited to, completing, as needed, and correcting any errors and omissions concerning descriptions, serial numbers, vehicle identifications numbers, or other descriptive information relating to the Collateral in the Equipment description herein and/or on any documents related hereto and executing any and all documents on behalf of Borrower including without limitation applications to state motor vehicle authorities for issuance of, changes to, or correction of certificate(s) of title covering any of the Collateral. Lender and/or Secured Party may unilaterally appoint an individual to act on its behalf as attorney in fact on behalf of Borrower and may add or change such authorized individual(s) by subsequent writing, and Borrower hereby waives notice of such appointment, change or additional appointment.   The term "Obligations" as used herein shall mean and include: (a) any and all loans, advances, payments, extensions of credit, endorsements, benefits and financial accommodations, previously, now or hereafter made, granted or extended by Secured Party to Borrower or on account of Borrower to any party on the debts of which Borrower is obligated or which Secured Party have or will become obligated to make, grant or extend to or for the account of Borrower or any party on the debts of which Borrower is obligated (including without limitation as endorser or guarantor); and (b) any and all interest, commissions, rent, obligations, liabilities, indebtedness, charges, late charges, prepayment premium, reasonable attorney's fees and costs and expenses now and/or hereafter chargeable against Borrower by Secured Party or owing by Borrower to Secured Party whether direct or indirect, whether contingent or absolute, whether matured or un-matured, and whether now or in the future arising, existing, incurred, contracted or owing to Secured Party or acquired by one or more assignments, transfers or otherwise, including but not limited to amounts due upon any notes or other obligations, given to or received by Secured Party directly from Borrower or by way of assignment from any one or more third parties and whether or not presently contemplated by the parties; and (c) any and all renewals, amendments, rewrites, increases, modifications or extensions of any of the foregoing. "Secured Party" means Lender and any and all of its affiliates, including without limitation Commercial Funding Inc. and Commercial Credit Group Inc., individually and collectively. Borrower hereby consents to the use and installation on the Equipment (at Secured Party's option and Borrower's expense) of global positioning or similar hardware that monitors the location of the Equipment.  Borrower may not remove or disable such hardware without the written consent of Secured Party. Borrower hereby irrevocably authorizes all third parties, including without limitation vendors, manufacturers, federal and state agencies, and motor vehicle authorities, to release to Secured Party all information relating to Borrower and all information relating to the Collateral requested by Secured Party, including without limitation global positioning (GPS) data, other information regarding location(s) of Collateral, information regarding the use of Collateral (including without limitation diagnostic reports and log books), and all information within the scope of 18 U.S.C. § 2721(a)(1) and (2) and similar applicable law. Borrower hereby releases and agrees to hold harmless such third parties for their disclosure of such data or information to Secured Party and agrees that such third parties are intended beneficiaries of this provision.

**13. DEFAULT & REMEDIES:** Borrowers will be in default if: Borrower fails to make any required payment under the EFA when due; Borrower fails to perform any other obligation of the EFA or other agreement with Secured Party; any representation or warranty made by Borrower is false; a material adverse change (as determined by Lender) occurs in Borrower's financial condition or Lender believes the prospect of payment is impaired; Borrower enters or has entered against Borrower insolvency, bankruptcy or similar proceedings; the death of a personal guarantor occurs or Borrower attempts to repudiate or revoke any agreement with Lender ("Default"). In the event of Default, interest on the entire unpaid principal balance at the maximum lawful rate permitted by law not to exceed twenty four percent per annum (the "Default Rate") shall automatically accrue until this EFA is paid in full (including without limitation after judgment); and Secured Party, with or without notice to Borrower, may retain Borrower's security deposit and/or upfront payments, terminate or cancel the EFA or any of Lender's obligations to Borrower, accelerate the indebtedness hereunder and/or other Obligations; sue for and recover from Borrower any and all amounts due Secured Party; enter the Collateral location and repossess and remove, or render unusable, the Collateral; require Borrower to make the Collateral available to Secured Party at a location determined by Secured Party; sell or lease the Collateral to any party without notice under such terms and conditions as Secured Party alone shall determine; refer the EFA to an attorney for collection; and pursue all other remedies available to Secured Party under the EFA, any agreement, any applicable law, or the UCC. Borrower agrees to pay all costs and expenses related to collection or repossession, including reasonable attorneys' fees (including attorneys' fees incurred post-judgment) and all repossession related expenses. If, upon Secured Party's demand, Borrower fails to surrender Collateral within 5 business days of such demand, Borrower agrees that a charge of $100 per day per piece of Collateral shall apply until such Collateral has been recovered or the indebtedness has been paid in full. In the event Secured Party sells all or part of the Collateral at public or private sale, then (i) Secured Party shall not be required to refurbish, repair, aggregate, separate, make available for inspection, or otherwise incur any expenses in preparing Collateral for sale but may sell its interest therein on an "AS-IS," "WHERE-IS" basis; (ii) Secured Party may bid or become the purchaser at any such sale; (iii) Secured Party may conduct a sale of Collateral at any time of year, notwithstanding the possibility that selling such Collateral at a different time of year may result in higher proceeds and/or proximity to any holiday or event, and Borrower acknowledges that any delay in disposition of Collateral poses an undue risk to Secured Party; (iv) Any public sale will be deemed commercially reasonable if a notification of the sale is sent to Borrower 10 days or more before the sale, advertised once or more prior to the sale in one or more industry or local publication(s) or listing service(s), such publication(s) or listing service(s) to be selected by Secured Party in its sole discretion and may be in print or electronic form, and upon terms of 25% cash down with the balance payable in good funds within 24 hours or other payment terms in the discretion of Secured Party, such sale taking place on any day of the week between the hours of 8 AM and 8 PM local time at any premises within the United States that may be accessed by prospective bidders at the time of such sale; (v) Any private sale shall be deemed commercially reasonable if a notification of the sale is sent to Borrower 10 days or more before the sale. Notwithstanding the foregoing, Secured Party shall not be required to employ any such disposition procedure, and the use of a different disposition procedure shall not be deemed commercially unreasonable because it varies from the foregoing procedures.  Borrower acknowledges and agrees that in any action or proceeding brought by Secured Party to obtain possession of any Collateral, Secured Party shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking, which is hereby waived by Borrower, and if Borrower contests Secured Party's right to possession of any Collateral in any action or proceeding, Borrower shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Borrower's unpaid Obligations, whichever is less. Borrower waives any right to notice or hearing in any action to recover possession of any or all of the Collateral. Borrower, at Secured Party's option, hereby irrevocably consents to the appointment of a receiver or keeper for the Collateral and/or all other property of Borrower, and of the rents, issued as proceeds thereof. Borrower, recognizing that in the event of default no remedy at law would provide adequate relief to Secured Party, agrees that Secured Party shall be entitled to temporary and permanent injunctive relief, an order or writ of possession of any or all Collateral, and/or an order directing Borrower to deliver any or all Collateral without the necessity of proving actual damages. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies. Borrower agrees that any delay or failure to enforce Lender's rights under the EFA does not prevent Lender from enforcing any rights at a later time. **Borrower agrees that Lender will not be responsible to pay Borrower any consequential or incidental damages Borrower may claim under the EFA or in relation to the Equipment.**



Initials

403X

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

**14. CROSS DEFAULT:** Borrower hereby agrees that a default under any of the Obligations shall constitute a default under all of the Obligations including this Agreement and that an event of default under any one of the Obligations is an event of Default under this Agreement.  If any payment is not made when due, or if there is a default by Borrower under any of the Obligations or a default of any guarantor of Borrower obligations under this agreement or any of the Obligations, then  all remaining payments shall, at the option of the Lender, or Secured Party holding such Obligation(s), without notice, become immediately due and payable, and the unpaid balance shall bear interest at the applicable default rate until paid in full.  All installments and other sums received by Lender shall be applied first to interest, late charges, costs, fees and expenses, and then to principal hereunder.

**15**. **CELL PHONE CONSENT:**  You agree that by providing Us with a telephone number for a cellular phone or other wireless device, You are expressly consenting to receiving communications – including but not limited to prerecorded or artificial voice message calls, text messages, and calls made by an automatic telephone dialing system – from Us and Our assigns, affiliates and agents to You at that number.  This express consent applies to each such telephone number that you provide to Us now or in the future and permits such calls regardless of their purpose.  These calls and messages may incur access fees from your cellular provider.

**16. FACSIMILE e-SIGNATURE:** Borrower agrees that a facsimile copy of this Agreement will be treated as an original and will be admissible as evidence of this Agreement. Borrower agrees to be bound by this agreement by signing it. IF THIS AGREEMENT HAS BEEN PROVIDED TO YOU ELECTRONICALLY ALONG WITH AN ACCOMPANYING ELECTRONIC SIGNATURE EMAIL AND YOU WISH TO ENTER INTO THIS AGREEMENT ELECTRONICALLY, YOU MAY SIGN THIS AGREEMENT BY COMPLETING THE ELECTRONIC ACCEPTANCE PROCEDURE IN THE ACCOMPANYING ELECTRONIC SIGNATURE EMAIL, INCORPORATED HEREIN. OTHERWISE YOU MUST SIGN THIS AGREEMENT BY COMPLETING THE SIGNATURE BOX ON PRINTED COPY OF THE AGREEMENT AND RETURN IT TO US BY U.S. MAIL OR OTHER MEANS APPROVED BY US.  IF YOU DELIVER THIS SIGNED AGREEMENT TO US BY EMAIL OR BY U.S. MAIL, OR OTHER MEANS APPROVED BY US, YOU ACKNOWLEDGE THAT WE ARE RELYING ON BORROWER'S REPRESENATION THAT THIS AGREEMENT HAS NOT BEEN ALTERED. YOU FURTHER AGREE THAT, NOTWITHSTANDING ANY RULE OF EVIDENCE TO THE CONTRARY, IN ANY HEARING, TRIAL OR PROCEEDING OF ANY KIND WITH RESPECT THIS THIS AGREEMENT, WE MAY PRODUCE A TANGIBLE COPY OF THE AGREEMENT TRANSMITTED BY EMAIL WITH THE ELECTRONIC SIGNATURE PROCEDURE AND SUCH SIGNED COPY SHALL BE DEEMED TO BE THE ORIGINAL OF THE AGREEMENT. TO THE EXTENT (IF ANY) THAT THIS AGREEMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, THE AUTHORITATIVE COPY OF THE AGREEMENT SHALL BE THE COPY DESIGNATED BY US OR OUR ASSIGNEE, FROM TIME TO TIME, AS THE COPY AVAILABLE FOR ACCESS AND REVIEW BY YOU AND US OR OUR ASSIGNEE.  ALL OTHER COPIES ARE DEEMED IDENTIFIED AS COPIES OF THE AUTHORITATIVE COPY. IN THE EVENT OF INADVERTENT DESTRUCTION OF THE AUTHORITATIVE COPY, OR CORRUPTION OF THE AUTHORITATIVE COPY FOR ANY REASON OR AS A RESULT OF ANY CAUSE, THE AUTHORITATIVE COPY MAY BE RESTORED FROM A BACKUP OR ARCHIVE COPY, AND THE RESTORED COPY SHALL BECOME THE AUTHORITATIVE COPY. AT OUR OPTION, THIS ELECTRONIC RECORD MAY BE CONVERTED INTO PAPER FORM. AT SUCH TIME, SUCH PAPER COPY WILL BE DESIGNATED OR MARKED AS THE AUTHORITATIVE COPY OF THE AGREEMENT.

**17. CHOICE OF LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina (excluding its choice of law rules). This Agreement shall be valid only upon approval and acceptance hereof by Secured Party in the State of North Carolina, which acceptance shall be evidenced by the funding of all or part of the loan proceeds evidenced hereby.  As used herein, "applicable law" refers to the applicable laws of the State of North Carolina and the United States.

**18. JURY WAIVER:** BORROWER HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR IN TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

**19. EXCLUSIVE JURISDICTION:** Client acknowledges that by execution and delivery of this Agreement, Client has transacted business in the State of North Carolina and Client hereby voluntarily submits to, consents to, and waives any defense to the jurisdiction of courts located in Mecklenburg County in the State of North Carolina as to all matters relating to or arising from this Agreement. EXCEPT AS EXPRESSLY AGREED IN WRITING BY SECURED PARTY, THE STATE AND FEDERAL COURTS LOCATED IN MECKLENBURG COUNTY IN THE STATE OF NORTH CAROLINA, SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OF ANY AND ALL CLAIMS, DISPUTES, AND CONTROVERSIES ARISING UNDER OR RELATING TO THIS AGREEMENT, WITH THE SOLE EXCEPTIONS THAT AN ACTION TO RECOVER POSSESSION OF ALL OR PART OF THE COLLATERAL OR ANY OTHER ASSETS OF THE BORROWER OR ANY GUARANTOR, HOWEVER DENOMINATED, MAY, IN THE SOLE DISCRETION OF SECURED PARTY, BE BROUGHT IN A STATE OR FEDERAL COURT HAVING JURISDICTION OVER THE COLLATERAL, AND/OR SUCH OTHER ASSETS, AND THAT JUDGMENTS MAY BE CONFESSED, ENTERED, OR ENFORCED IN ANY JURISDICTION WHERE THE BORROWER, GUARANTOR, COLLATERAL, AND/OR ANY OTHER ASSETS OF THE BORROWER OR GUARANTOR MAY BE LOCATED.  BORROWER IS REQUIRED TO GIVE SECURED PARTY WRITTEN NOTICE OF ANY CLAIM OR CAUSE OF ACTION WITHIN SIX (6) MONTHS AFTER SUCH CLAIM OR CAUSE OF ACTION SHALL ACCRUE; FAILURE TO DO SO SHALL BAR BORROWER'S CLAIM OR CAUSE OF ACTION.  **THE PARTIES AGREE THAT THE VALIDITY AND ENFORCEABILITY OF THIS EFA AND EACH OF ITS TERMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NORTH CAROLINA**.

---

**ACCEPTED:**  The undersigned hereby represents and warrants that s/he has the requisite legal and actual authority to execute documents of this type on behalf of Borrower.  If more than one party signs this EFA as Borrower, the obligations of each of them shall be joint and several.

**BORROWER: DB Transports LLC**

DocuSigned by:

X _____         9/7/2024

**Donsheki Fredrick Barrett**                    **Date**
5ABC70C6046B47E...

**Member**

Initial

DFB

Initials

03X

EFA.0624F